Mr. Collins? Yes your honor. Thank you and before you both start I just want to remind the lawyers that you do have two minutes to present your case without interruption from us and after those two minutes are up you should be prepared for questions from the court. Thank you your honor. You may begin. Thank you. May it please the court, counsel, Patrick Collins on behalf of the appellants the city of Roseville and officers Jorgenson and Eckert in this matter your honor this is a case involving qualified immunity and the use of deadly force and therefore the legal issues before the court are whether a reasonable officer and officer Jorgenson and Eckert's position could have believed that Mr. Birkeland posed an imminent threat of serious physical harm to the officers and number two whether the use of deadly force under these circumstances was forbidden by clearly established law. In our case the officers are entitled to qualified immunity because a reasonable officer in their position clearly would have believed that Mr. Birkeland was an imminent threat of serious physical harm and number two more importantly no court has ever forbidden the use of deadly force under these circumstances and these circumstances your honors are the undisputed facts found by the district court which are the following. Mr. Birkeland was hiding from the police in a two and a half foot wide by seven foot five inch long bedroom closet. Officer Jorgenson ordered Birkeland to come out of the closet. Mr. Birkeland refused. Officer Jorgenson slid open the closet door and at gunpoint ordered Birkeland to come out of the closet. Again Mr. Birkeland refused. Instead Mr. Birkeland produced a long knife and stabbed a canine officer in the head directly in front of officers Jorgenson and Eckert. This was less than seven feet five inches away from the officers at time. Afterwards at gunpoint officer Jorgenson and Eckert excuse me officer Jorgenson at gunpoint ordered Mr. Birkeland to drop the knife repeatedly. Mr. Birkeland refused. Instead while being less than seven feet five inches away and after stabbing a dog in the head and after refusing numerous orders to drop the knife Mr. Birkeland turned towards the officers faced them and came out of the closet with the knife in his hand. Despite these undisputed facts the district court found that there was denied some qualified immunity claiming their fact issues with regard to whether or not the officers had a probable cause to believe that a felony had been committed. The district court also found that a reasonable juror could believe that Mr. Birkeland was not an imminent threat to the officers and if so the use of deadly force would have been forbidden under Tennessee regarding. Your honors the district court's decision must be reversed because the legal principles and again as more importantly no court has ever forbid the use of deadly force under these circumstances. I'd like to first address the second prong of the qualified immunity analysis and then I'll go to the first prong because I think I think the second prong is decisive of the issue in this case which is that there's no the plaintiff in this case has the burden to show that there is a a a prior decision that forbid the use of deadly force under these circumstances and it has failed to do so at the district court level and it has failed to do so at this level. In particular your honor there is no case law that forbid the use of deadly force under these circumstances in fact all the case law from this circuit and also from the supreme court justified the use of deadly force under these circumstances. For example in the decision of Morgan versus Cook in that situation Mr. Morgan was 12 feet away from the officer, Officer Cook at the time. He was attempting to conceal a knife. He refused to drop the knife at gunpoint and he lifted a foot as if to take a step. He didn't take a step but he lifted the foot as if to take a step and he was shot and killed by Officer Cook. This court found that was a reasonable use of deadly force under the circumstances. In our situation the situation was much more harrowing, much more violent, and much more frightening because unlike Mr. Morgan Mr. Birkeland used the knife. I do have a question about the use of the knife. It's a little it's not quite clear to me in the record as you presented it just this afternoon you said that that Mr. Birkeland stabbed the dog in front of the officers but that's different than saying the officers saw it. Is there evidence in the record that one of one or more of the officers witnessed that stabbing because I thought there was some question as to whether or not that happened and there was concern that it might have happened but I didn't know if anybody testified they saw it. Yes your honor Mr. excuse me Officer Jorgensen testified that he witnessed it he saw it and in fact the plaintiff has admitted in their complaint that it actually happened. So it's an undisputed fact that the district court found that Mr. Birkeland did stab the dog directly in front of Officer Jorgensen who was witnessing the whole thing and he was less than seven feet from the officers when it happened and I want to be clear that seven feet five inches is actually the far end of the of the closet it's the drywall so actually Mr. Birkeland was much closer than seven feet five inches but giving with all facts construed in favor of the plaintiff we're saying he was closer than seven feet five inches at the time of the incident. Now so what about the fact that there seems to be a factual dispute about whether the officers or whether he lunged or moved towards the officers if we assumed that he was that the dog was pulling him towards the officers you know does that change does that change your view of the deadly force used in this case? No to answer your question your honor no it does not there is the district court did not find it was pure speculation that the dog was biting Mr. Birkeland at the time of the incident in fact the district court found that at the time of the dog was attempting to re-engage its bite which means it wasn't engaged at all and I would argue that just like the officers in the estate of Morgan versus Cook and in the recent cases Hurdge and V. Judd both officers argued that the victim in those cases lunged towards them or moved towards them and this court held that for summary judgment purposes let's assume that he wasn't moving towards them at all the the shooting was still reasonable under the fourth amendment and no court forbid the use of deadly force under those circumstances and that's precisely what we could do in this case your honor also your honor is that I don't believe it changes the analysis at all and in fact if we assume for summary judgment purposes that Mr. Birkeland was not moving towards the officers it falls directly in line with the estate of Morgan versus Cook case and in the recent case that this court sent down in Swearingen v. Judd where a man where officers confronted a man in a closet similar to ours in close quarters and in that case Mr. Swearingen held the knife down by his by his leg he didn't make any movements towards the the officer the he was subsequently shot and killed in this in this court held and I want to make sure I quote this correctly from the opinion it held that when it granted qualified immunity it held it was not firmly established in August of 2014 that an officer was forbidden to discharge his firearm when suddenly confronted in close quarters by a non-compliant suspect armed with a knife that's in our case your honor Mr. Birkeland was non-compliant but unlike Mr. Swearingen Mr. Birkeland didn't conceal a knife or attempt to conceal a knife he used the knife he stabbed a police canine officer in the head less than seven feet in front of officers and then after he got done stabbing the police dog he turns and faces the officers and at gunpoint repeatedly refuses to drop the knife I want to follow up on this is it you mentioned that it was speculative that the dog was still biting Mr. Birkeland was there and I want to know the difference here was there no evidence that the dog was biting Mr. Birkeland at the time or did the district court dismiss that evidence and say look I just think that evidence is speculative I just want to an expert opinion with regard to that opinion but the district court did not consider that on for some enjoyment purposes consider that a minor standing consider that speculation there was no other than an expert go ahead excuse me did the district judge in the findings in his statement of facts say that the dog had engaged the handling officer was attempting to pull the dog away and that the dog attempted or re-engaged I think that that's and I don't have the language right in front of me but that's my recollection of the record actually your honor what the dog what the district court said was at the time of the shooting the officer Jorgensen was pulling the dog out and the dog was attempting to re-engage its bite which means it wasn't engaged okay um in Swearengen the uh the uh the uh the person who was shot was a uh suspect uh from off as a fleeing felon it was a property felony but it was still he was still fleeing and fled into his home and then into his door into his closet and the closet had doors on both sides of it so uh there was there was there were some reasons to indicate that that had he wished to just evade the or avoid the confrontation he could have gone out the back door of the closet but now in this case there's no other way out the dog is either engaged or not engaged and he is just an emotionally disturbed person uh who you're there on a community caretaker function does that make any difference at all um I would I would disregard with some of the characteristics of the of the evidence he said your honor but in our situation we didn't know who was in the closet we didn't know it was John Birkeland in the closet until after the uh use of force was used we entered the uh apart of the apartment uh on the understanding or on the suspicion that a robbery had taken place we didn't know how many people were in the in in the apartment we didn't know how many people were in the closet or if there were any weapons in the closet um so uh to answer your question whether or not the officers could have done something differently uh I would argue does not change the uh use of force analysis we don't judge officers actions by 20-20 hindsight of what could happen it's whether a reasonable officer in their position would consider uh Mr. Birkeland a imminent uh threat of of great bodily harm or death at the time um and whether or not the use of force is forbidden under those circumstances um there was no evidence that uh we knew that it was Mr. Birkeland in there or uh in the closet or it was someone else and there was there was no evidence that he was actually having an emotional breakdown at all your honor uh that that was not a part of the uh the district court's finding uh but uh to answer your question whether or not he was having a uh emotional breakdown or was having some kind of mental uh episode it would not change the uh fourth amendment analysis we still judged the reasonableness at the time of the use of force and in this case I would argue that the use of force was reasonable just as your honor had found with the uh the Swearinger decision I know that decision was uh determined on the second prong of the qualified immunity analysis but I understand you specifically concurred that that uh even under the first prong the use of deadly force under that situation would have been found reasonable in this in this case you've mentioned the concern about there being someone else in the apartment as I understood the record they went through the the dog went through the kitchen and um another room the bathroom and then he he alerted or whatever term they used to find a human in the bedroom were there was there any did the record show that there were other rooms in the apartment that were of concern for the officers uh to answer your question your honor at the time they cleared all the rooms except for the bedroom at that time when the dog alerted to the closet the issue was um they uh officer Jorgensen could not tell if there was anyone else in the closet other than the person that he was seeing when he opened up the closet door and he also couldn't tell whether he couldn't see uh uh Mr. Birkeland's hands and he couldn't tell if there were any other weapons in there at the time he ordered Mr. Birkeland out of the closet uh and then when Mr. Birkeland refused to do so that's when uh Mr. uh excuse me Officer Jorgensen slid open the closet door and at gunpoint ordered him to come out with his hands out up again he refused and that's when the dog was uh the he witnessed Mr. Birkeland reach down to the floor uh and that's when he released the dog and that's when Mr. Birkeland came up with the knife and stabbed the dog in the head in front of Officer Jorgensen and it does the record show that he saw both hands at that point so we've got one hand with the knife that was used against the dog and then the other hand is free is he a right-handed person i don't know which way that went but did you see hands i don't i don't believe the record shows that he saw the other hand your honor i'll uh with that i'll save the prepare for you thank you your honor uh can everyone hear me as yes we can okay thank you good afternoon your honors may it please the court council your honors i am james berenbrinker um my co-counsel karen chiano and i together will represent dean dean birkeland as trustee of the estate of his brother john birkeland who was shot killed on february 10th 2016 by two roseville city police officers john jorgensen and kyle eckard who along with a 75 pound belgian mallon new uh police dog sergeant adams their street supervisor and at least four other roseville city police officers who were inside john's one bedroom apartment to check his welfare at summary judgment the district court concluded that genuine issues of material fact precluded summary judgment for defendants on the deadly force claim and denied qualified and official immunity on the deadly force claim jorgensen and eckard's interlocutory appeal followed the district court granted uh police officers qualified and official immunity based on the trustees claims concerning forced entry of john's home and the deployment of a police dog under a bite and hold uh command and sergeant adams based upon immunity of um based on qualified immunity on a failure to supervise claim trustees cross appeal followed your honors the facts in this case are in tremendous dispute the trustee proffered significant evidence which contradicts appellant's version of how the events folded and unfolded on the night of february 10th 2016 the question of what is known to the officers is reviewable by the court to determine if facts would inform a reasonable police officer that his actions violate legal standards so in this case what did the police officers know and when did they know it when police arrived at the scene they knew that two of berkeland's neighbors had telephoned requesting a welfare check on the man who lived in apartment 11 because they could hear a man screaming and hollering inside his apartment that was another they described it as another verbal outburst inside his apartment and they informed the police that he may have mental health issues based upon those requests for a welfare check officers christiansen and vang were dispatched by the roseville police department to berkeland's apartment in order to check on him on the way to the apartment they learned that there was a bench warrant for a so when christiansen and vang arrived at john's apartment christian officer christiansen turned on his body cam and recorded the events at berkeland's home a copy of the body cam audio and video it may be found at appendix 128 and a copy of the transcript of the audio recording is at appendix 408 the transcript was at summary judgment was originally attached to the affidavit and incorporated into the affidavit of janelle lundberg who prepared the transcript and that's located at appendix page 396 the actual transcript of the recording is at page 408 of the appendix it's very important to review the recordings on the body cam because that uh the the recordings the audio or the audio and video recording produced by the police department in connection in discovery in this case has is time marked or it's time minute and second marked in right on the on the video and what it shows is that at the one minute and 15 second mark of the cam recording officer christiansen shouted john it's the police open the door within four seconds john was at the door and responded oh i'm okay could we go forward maybe fast forward through that uh timeline so we can maybe focus more on what happened and what's really truly in dispute uh in the bedroom um and because i'm i'm curious of what if everyone agrees sort of on a timeline um during when there's it's blacked out and i'm not sure why that is but there's a time when you can no longer see uh see from the camera and i'm and is there a is there a dispute as to how much time passed between um the dog going in the the what everyone i think is assuming is the bite the withdrawal then potential re-engagement and then the shots is that in dispute yes it is your honor the sergeant adams once jorgensen gave the command at the threshold of the door to to the dog to find him that was at the 24 33 mark of the video it only took the officers approximately one minute to locate john in inside the closet of his bedroom at the 24 27 mark jorgensen can be heard yelling come out of the closet you're going to get bit two seconds later two seconds later jorgensen states i got contact officer eckert and jorgensen both testified that when he said i got contact that meant that he could see jargon or birkeland rather inside the closet one second later at the 24 30 mark officer says john come out of the closet with your hands up you're under arrest 24 33 jorgensen announced the dog's on come on john the dog's on command testimony from the officers means that the police dog was already in the closet and already biting jorgensen after the 24 35 mark jorgensen said then jorgensen said i can't see his hands come on out one second later jorgensen says show your hands one more sec you're under arrest 24 39 let go of the knife so jorgensen did not see a knife he testified and the or excuse me the camera the recording from the body cam proves or shows conclusively that when jorgensen did not see a knife no knife appeared until after the dog had been in the closet biting and attacking mr birkeland for at least a minimum of six seconds well counsel i think you're still focusing on stuff that is part of the cross appeal and i'm not sure that the cross appeal is actually before us i think and i don't want to speak for judge kelly but i can tell you what i'm interested in i'm interested in what happened after that for the use of deadly force because the district court broke it down into discrete uses of force and discrete actions by the officers and so i'm trying to focus in on what i think might actually be before us well unless unless you can combine unless you can make the connection well in terms of the use of force your honor the time is critical because when counsel was giving his recitation of the facts it's not in it that we dispute his recitation we've proffered as much evidence and the most important critical evidence we believe in terms of how the events actually unfolded when the officer when the two officers shot and and killed john birkeland can be gleaned directly from the body cam audio and video but the at 24 41 on the recording the dog yelps jorgensen then says simultaneously let go let go let go 24 43 less than three seconds after john defends himself against the attacking dog four shots are officer jorgensen and ecker shot john the dog had been in the closet for six seconds attacking him biting him they he jorgensen did not see say that he couldn't see his hands or mention show your hands until after the dog was already attacking him the knife didn't appear until after the dog had been biting him and attacking him for from six to eight seconds and then when uh jorgensen says when the dog yelps within two within two or three seconds the officers kill him shoot him three times four to four shots that hit him three times is there enough time then i mean you're the theory that i understand you mean you made before the district court was that the dog had re-engaged um and it bit your you know uh mr uh again and it pulled him out of the closet towards the officers i don't i'm not sure that there's time for that maybe i'm wrong we didn't argue your honor that he re-engaged we argued that uh he was biting he attacked jorgensen and we pointed to the autopsy uh records the autopsy report that's part of the record which showed that john uh suffered at least 10 deep puncture wounds which uh exposed were which was down to and exposed the bone exposed revealed ligaments tendons and fascia um the all of that occurred during this we contend and we believe the record shows all occurred during the six to nine seconds that the dog was attacking and biting john in the closet had been sent in there immediately uh after jorgensen made contact within one second or two seconds of jorgensen saying i got contact he sent the dog in the dog's in there for six or more seconds biting jorgensen as soon as he stabbed uh within two within two to three seconds at the most jorgensen and eckhart fired three times or four times and hit him three times killing him instantly in your view where was the dog at that time was the dog still biting mr berkland or was the dog doing something else we believe that the dog was was attached to berkland we believe the record shows that the dog was attached to berkland throughout uh jorgensen testified that he pulled the dog out of the closet and berkland then uh got himself into a football stance and lunged or launched himself out of the closet and and jorgensen shot john and then once jorgensen shot john uh john either fell back into the closet or went back into the closet out of fears what jorgensen said we offered uh there's significant evidence in the record uh showing that uh that contradicts jorgensen's statement that john ever left the sitting or squatting position at the back of the closet in fact eckhart who fired one time testified that john when he fired uh john was sitting or and that the dog was on john was between the officers and that there's a lot of clothes or clothes and so on hanging in the closet and eckhart testified he had about an eight inch window to shoot through in order to hit um berkland um so the underlying theory is he wasn't a threat at that point the dog in your view the dog was attached to him he was in a sitting or he would not have constituted a threat to the officers that's correct um we and the um other evidence that's in the record to dispute jorgensen's uh rendition or version of the facts is that well besides the autopsy report and the nature of the injuries uh it would have been almost impossible for jorgensen to physically do in two seconds what jorgensen claims that he did well how is that impossible physically i mean you've said that a number of times and i'm just having a hard time with that because a man can run 18 yards in two seconds it happens on every single day on some football field someplace a person can explode out of a uh of a football stance and move four yards in less than a second right and so it's not physically impossible and there's nobody who's testified as i understand it about what exactly happened there except the officers and their their version is that he lunged forward and now whether he lunged or fell or whatever i'm not sure that really matters if you look at our line of cases that reasonable um but i'm mistaken but reasonable uh use of deadly force but i mean um why is it impossible i don't get that under the totality of the circumstances and the particular facts in this case your honor uh eckhart officer eckhart testified that jorgensen was seated or squatting at the back of the closet that the dog was on him that the dog was in between uh berkeland and jorgensen and him when he fired um he testified he did not see uh jorgensen uh get up or come at the officers he testified that he had to fire through a about what he described as an eight inch window between the the the lowest end of the window being the dog and the upper being the overhanging clothes and then you couple that with the fact that with the uh the defendant's own expert testified uh i believe he called it uh he described the closet as providing significant geometric uh geometrical obstacles or something like that because there were laundry baskets or plastic containers boxes and so on on the floor in the closet making it very difficult for anybody to walk through the closet to begin with but you attached to uh berkeland and the testimony of eckhart that he was attached plus the second cover officer testified or told the bca rather he tried to contradict himself at his deposition but he did testify under oath that his uh what he said uh to the bca during that interview was truthful he told the bca that he could see uh before the shooting berkeland's left leg was flat on the floor and that it wasn't you know as if he had he thought he might have even been laying on the floor before the shooting seconds and we know that all of this could only have been a second or two before because from the time uh berkeland uh stabbed the dog in self-defense only two to three seconds elapsed before he was dead before council i want to follow up on that because i think that judge erickson's raised an interesting point which is you know if you assume or that a human being could do something in a couple of seconds and you have berkeland having just stabbed the dog in the he's only a couple of feet away and he's already shown aggression towards the dog and even if he hasn't lunged yet uh towards the officers assuming that we we can you know if it's true the record in that way a reasonable officer might say jeez i got to protect myself this guy's dangerous well the the question is whether or not the officers would have had probable cause to believe that jorgensen or that berkeland excuse me presented an imminent immediate threat of serious bodily harm or death under the totality of the circumstances given the time that he left they didn't in our view he did not the officers did not give berkeland an opportunity to respond to their commands but most importantly there was a dog attached to john he was biting him he had bitten him he had 10 deep puncture wounds in his right knee and upper leg area if you look at the photographs that part of the record when they pulled him out his left his right knee pants leg was completely torn and ripped from where the dog was uh pulling on him and nagging at him and trying to get and getting at him in order to the all of this would have happened had to have happened within the biting and so on took place over six seconds before he even stabbed the dog there's a relevance to the fact though that i know your argument is he didn't have time to respond to the officer's commands but is there relevance to the fact that they had spent a great deal of time earlier i understand in a different context asking mr berkeland to comply open the door you know other other things and he had refused from what i can tell to comply at most steps in the process is that relevant to what the officers were facing no i don't believe so i think it's relevant it's they claim that they entered the uh apartment entered forced entry into john's home pursuant to the caretaker exception to a warrant requirement when they did that they knew they didn't have a warrant and they're claiming that they're uh that they could go in there based on on a reasonable belief a rational uh reasonable belief that there were uh there was an emergency or there was a situation that required their attention but yet they waited outside the apartment for 20 minutes before going into the apartment once they went into the apartment within a minute they had cleared the apartment they had located him in the in the closet at that point if the purpose was in fact a welfare check and the purpose for breaking in was pursuant to the caretaker uh exception to a warrant requirement was to merely locate john mission accomplished they should have removed the dog at that point in time they didn't do that instead they immediately upon contact within one second sent the dog into the uh closet for one purpose to bite him and to hold him that was the command that's how he was trained and that's what the dog did he did exactly what he was trained and then six to nine seconds later john defended himself against this excessive force which is right to defend himself against this dog because it was unreasonable as the district court concluded i see my time is up but i judge kelly could i ask one more question that that i just i forgot to ask which is the um official immunity i just want to understand your position on this if the officers have official immunity then does the city have vicarious official immunity in other words do they depend on each other i would say that if the officers are liable or are culpable under and are not granted official immunity i believe that this the city would be uh culpable as to um sergeant as to sergeant adams excuse me does that go the other way too most likely if the yeah if the officers are not like or get official immunity then the city would as well i believe that's i don't i haven't i didn't brief that i don't off sorry thank you thank you thank you mr baron breaker uh mr collins i think you have some rebuttal time yes thank you your honors uh there's a few things i'd like to address uh mr uh baron breaker mentioned a lot of uh of uh arguments and accusations that i uh specifically addressed in my reply memorandum a lot of the same arguments that he made at the district court fell on deaf ears because they weren't supported by the evidence i everything we cited in our brief was cited by the district court the district court did not find that the dog was attached at the time of the deadly force was used because there wasn't evidence to support that the the officers testified that once the dog was bit the dog disengaged the bite so once excuse me once the dog was stabbed the dog disengaged the bite and the district court found that to be credible and true and also found that at the time of the deadly force that uh officer jorgenson was pulling the dog out when it was not engaged with mr birkland and it was attempting to re-engage its bite that's what the evidence shows and that's what the district court found there is absolutely no testimony or evidence that uh officer eckardt said that he saw the dog biting of mr birkland that is pure fantasy you will not see that within his uh deposition transcript whatsoever where officer eckardt said was when he peered inside the closet he's after mr birkland had stabbed the dog he saw mr birkland facing the officer still holding the knife and leaning towards the officers after stabbing the dog at a very close distance in fact he testified it was four feet at that point now one thing that you you did not hear mr berenberger say once because he still has failed to cite one case in which the use of deadly force was forbidden under these circumstances because he can't there isn't a case that forbid the use of deadly force under these circumstances all the case law as as uh as judge erickson pointed out uh it whether or not he was coming towards the officers or not the estate of morgan the swearinger v judd and even cassella the hughes case supports the position that the use of deadly force was reasonable under the circumstances and more importantly it was not clearly forbidden by uh clearly established law and therefore your honors we ask that you grant the the um and and uh also to address i'm sorry uh the uh judge ross's uh uh question regarding official and vicarious official immunity you're absolutely right if the officers are entitled to vicarious official immunity i mean excuse me official immunity then the city would be entitled to vicarious official immunity so with that we'd ask that you uh reverse the district court's uh determination judgment and grant the officers a qualified meeting in this matter thank you thank you both for your arguments we will take the matter under advisement and issue an opinion in due course thank you